692 So.2d 544 (1997)
Mona MECHE, et vir., Plaintiff-Appellant,
v.
WAL-MART STORES, INC., Defendant-Appellee,
And all Consolidated Cases.
Nos. 96-981 to 96-1025.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1997.
Writ Denied May 9, 1997.
*545 Elizabeth Ann Dugal, Christopher Leonard Zaunbrecher, Lafayette, Jo Ann Nixon, New Iberia, Kim Reginald Hayes, Crowley, Joslyn Renee Alex, Breaux Bridge, Lawrence E. "Tony" Morrow, Jr., for Mona Meche et vir., et al.
John Groulding Swift, Lafayette, for Wal-Mart Stores, Inc.
Thomas Reginald Hightower, Jr., Lafayette, for Thad Burleigh.
Alfred Frem Boustany, II, Lafayette, Peter David Guarisco, III, Baton Rouge, Howard Wallace Martin and James L. Brazee, Jr., Lafayette, Ted L. Ayo, Abbeville, Bret Christopher Beyer, Lafayette, for Annette Dupree et al.
Before DOUCET, C.J., and WOODARD and GREMILLION, JJ.
DOUCET, Chief Judge.
These 45 consolidated cases arise out of the act, by an overly zealous Wal-Mart security employee (referred to by Wal-Mart as a loss prevention associate), of placing a closed circuit T.V. camera in the ceiling of the unisex employee restroom. The trial consisted of a number of parts tried separately. The first part, involved the consolidated actions of four plaintiffs: Mona Meche, Linda Ardoin, Theresia Powell, and Michele Robertson (now Hebert). That portion of the case was bifurcated into liability and damages phases. At the close of the liability phase, before the case went to the jury, the trial judge granted defendants' motion for a partial directed verdict on the issues of sexual discrimination/harassment and punitive damages. On the remaining issues submitted to the jury, abuse of rights, intentional infliction of emotional distress and invasion of privacy, it found for plaintiffs only on the issue of intentional abuse of plaintiffs' rights. The damages phase of the four employees who testified at trial was then conducted. Of those four plaintiffs there were two individuals who underwent medical and/or psychological treatment and two plaintiffs who had only "token" psychological care (i.e. one and three visits respectively). Here, the jury awarded damages to the two plaintiffs who underwent treatment, but denied damages to the others.
The jury was then asked to decide the claims of the remaining employees who were certified a members of a class action. In connection with this portion of the trial, plaintiffs voluntarily dismissed the loss of consortium claims of all spouses of the remaining plaintiffs. No further testimony was elicited, but rather a stipulation was entered into whereby all parties agreed that if any or *546 all of the remaining plaintiffs were called to testify, they would testify in accordance with the four who had already done so, except that none of the remaining plaintiffs had sought medical or psychological care. The jury found that these plaintiffs had sustained no injuries by the camera incident.
Plaintiffs appeal listing twenty alleged errors, only eleven of which were briefed. Accordingly, as per Uniform Rules, Courts of Appeal Rule 2-12.4, the remaining assignments of error are deemed abandoned.

LIABILITY PHASE-FACTS
In June 1992, Thad Burleigh, the Loss Prevention Associate for the Nothhside Wal-Mart store in Lafayette, had reason to believe that a member of the night receiving crew was stealing merchandise from the store by taking it to either the break room or the employee restroom, removing the item from its packaging, and concealing the pilfered item under his/her clothing. Feeling the restroom was the most likely place of occurrence of the suspected offenses, Burleigh decided to secrete a closed circuit television camera in the ceiling of the employee restroom in an attempt to apprehend the suspect. On Friday, July 3, 1992, he placed the camera, to which he had attached a "Rabbit" transmitter, atop a ceiling tile in the restroom. He connected both the camera and the transmitter to an electrical extension cord which he ran into the drop ceiling from a storage area nearby. His intention was to complete his installation, by placing the camera in a position to view an area of the restroom near the doorway, after the store closed Friday evening and then tape the night crew with one of the video recorders (VCR) located in the loss prevention office. However, before he completed his installation he learned that the night crew was not scheduled to work over the 4th of July weekend. Consequently, he never repositioned the camera where it could view any portion of the restroom nor did he connected the "Rabbit" receiver to a VCR, rather he just left everything as it was.
Sometime between 4:45 P.M. and 5:15 P.M. on Monday, July 6, 1992, Burleigh returned to the employee restroom to finish the ceiling installation in order to record the receiving crew that evening. A ceiling tile in the restroom already contained a hole through which a sprinkler head protruded. Burleigh enlarged the hole and rested the camera, lens down, against the water pipe servicing the sprinkler. Before Burleigh could connect the "Rabbit" receiver to either a monitor or a VCR in the loss prevention office, the camera lens slipped through the enlarged hole and was discovered by Beth Hopkins, a Wal-Mart associate. Ms. Hopkins stated that she was using the restroom while on a break, at approximately 5:00 P.M., when she just looked up and saw a camera lens protruding through the ceiling tile. [One other employee, Theresa Robichaux, also claims to have seen the camera, but she did not communicate this to anyone at the store. Additionally, it appears that she worked 9:00 A.M. to 5:00 P.M. Thus her shift ended before the time Mr. Burleigh testified he cut the tile and mounted the camera and probably before Beth Hopkins made her discovery. Other testimony also discredits Ms. Robichaux's claim.]
Upon discovering the camera in the restroom ceiling, Ms. Hopkins first announced her discovery to other associates seated in the employee lounge and then notified one of the assistant managers. She was unsure if that person was L.J. Meche or Carl Dugas. Mr. Dugas confirmed that he was the first representative of management Ms. Hopkins notified. Mr. Dugas notified L.J. Meche, another assistant manager, and paged Thad Burleigh to the manager's office. Mr. Meche first moved the camera (and transmitter) away from the hole in the tile. He later retrieved the video equipment from atop the ceiling tile and brought it to the manager's office.
Burleigh admitted he had placed the camera in the restroom ceiling and explained his motive was to attempt to catch a thief. He maintained that the receiver had never been connected to either a monitor or a VCR and that neither he nor anyone else had viewed or taped anyone in the restroom. Burleigh further admitted that his actions were in violation of Wal-Mart policies and that his actions were taken without the knowledge or authority of anyone above him in loss prevention *547 or in store management. Upon learning that Burleigh had placed the camera in the employee restroom, Wal-Mart management terminated his employment. According to uncontradicted testimony, all the tapes in the loss prevention room were viewed by Wal-Mart management and none were found to contain any restroom scenes. At the conclusion of Wal-Mart's investigation, approximately two weeks after the incident, representatives from the home office came to Lafayette and presented their findings to the store employees in a store meeting. Some employees were not satisfied with the investigation and this suit followed.

LIABILITY: DISCUSSION OF LAW AND ALLEGED ERRORS
Appellants first three assignments of error deal with their "invasion of privacy" claim. They object to the trial court's jury charge which required that "the plaintiffs must prove by a preponderance of the evidence that there was a viewing or recording of a plaintiff in the restroom" in order to recover and the jury's conclusion that there was no invasion of privacy. In Louisiana, the plaintiff has the burden of proving her case by a preponderance of the evidence, i.e. the evidence, when taken as a whole, must show that the fact or cause sought to be proven is more probable than not. Kendrix v. Read Lumber & Supply Co., 28,612 (La.App. 2 Cir. 9/25/96); 680 So.2d 1287. Hence this portion of the trial judge's charge is correct. As to the viewing/recording portion, the heart of plaintiffs' argument on this point is based upon four cases from common law states: Michigan, Maryland, Kansas, and New Hampshire. We find no Louisiana cases on point and are not persuaded by the holdings cited from the common law jurisdictions. Mr. Burleigh testified that the video equipment in the loss prevention room was never configured so that it could receive any picture from the restroom. This was verified by testimony by an assistant manager, L.J. Meche. And even though plaintiffs would have us believe other wise and would have us believe that employees were taped while using the restroom and that Wal-Mart subsequently destroyed those tapes, there is simply no proof of those allegations. At best, we consider the facts herein to have established an attempted invasion of privacy. However, since we know of no such tort, we find we have no choice but to find there was no clear error committed by the trial judge in giving this instruction. And, considering the evidence and testimony adduced at trial we find we must affirm the finding by the trier of fact on this issue.
Next, appellants that the trial judge erred in dismissing their claims under the federal Electronic Privacy Act. We find no merit to this claim. Not only was there no interception of any electronic transmission, but the statute at issue, 18 USCA § 2520(C)(2) limits recovery to "any persons whose wire, aural or electronic communication is intercepted, disclosed, or intentionally used ..." In the case at bar, the plaintiffs neither initiated nor engaged in any communication of any sort. The conduct of which they complain simply, does not fit the conduct proscribed by the statute.
The next three assignments of error concern the trial judge's dismissal of plaintiffs' sexual harassment claims. This court discussed the elements of sexual harassment in Craven v. Universal Life Insurance Company, 95-1168, pp. 4-9 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, 1362-64, wherein the court explained:
La.R.S. 23:1006, which prohibits discrimination in employment on account of race, color, religion, sex, or national origin, states, in pertinent part, that:
B. It shall be unlawful discrimination in employment for an employer to:
(1) Intentionally fail or refuse to hire, refer, discharge, or to otherwise intentionally discriminate against or in favor of an individual with respect to compensation, terms, conditions, or privileges of employment, because of race color, religion, sex, or national origin; or
(2) Intentionally limit, segregate, or classify an employee in a way which would deprive an individual of employment opportunities, give favor or advantage to one individual over another, or otherwise adversely or favorably affect the status of an employee because of *548 race, color, religion, sex, or national origin.
Louisiana's anti-discrimination statute is similar to the federal statute prohibiting sex discrimination in Title VII of the Civil Rights Act of 1964, U.S.C. § 2000e, et. seq. As such, Louisiana's courts have properly looked to the federal statute to ascertain whether a valid claim for sexual harassment has been asserted. Spears v. Rountree Oldsmobile-Cadillac, 26,810 (La.App. 2 Cir. 4/5/95), 653 So.2d 182; Alphonse v. Omni Hotels Management Corp., 94-0157 (La.App. 4 Cir. 9/29/94), 643 So.2d 836.
Under Title VII, the jurisprudence recognizes two types of sexual harassment which affect the "compensation, terms, conditions, or privileges of employment," namely: (1) quid pro quo harassment, which occurs when an individual explicitly or implicitly conditions a job, job benefit, or the absence of job detriment, upon the employee's acceptance of sexual conduct; and (2) hostile environment harassment, which consists of verbal or physical conduct that has the effect of creating an intimidating, hostile, or offensive work environment. Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Bustamento v. Tucker, 607 So.2d 532 (La.1992).
To prevail in a hostile environment harassment claim, the plaintiff must assert and prove that: (1) she belonged to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the sexual harassment and failed to take proper remedial action. Polk v. Pollard, 539 So.2d 675 (La.App. 3 Cir.1989). In Brown v. Vaughn, 589 So.2d 63, 65 (La.App. 1 Cir.1991), the first circuit explained how a hostile work environment affects a term, condition, or privilege of employment:
The type of conduct constituting such harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. Such misconduct constitutes sexual harassment regardless of whether it is directly linked to the grant or denial of an economic quid pro quo, if the purpose or effect of the misconduct is to unreasonably interfere with an individual's work performances or to create an intimidating, hostile, or offensive work environment. Every act of harassment, although reprehensible, does not necessarily give rise to a hostile environment claim. To be actionable, the harassment must be sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive, hostile environment.
In general, hostile environment harassment is characterized by multiple and varied incidents of offensive conduct which have the cumulative effect of creating a hostile working environment for the employee thus victimized. [Citations omitted].
In determining whether an environment is hostile, several factors are relevant in the inquiry: (1) frequency of the discriminatory conduct; (2) the severity; (3) whether the conduct is physically threatening, or a mere offensive utterance; (4) whether the conduct unreasonably interferes with an employee's work performance; and (5) the conduct's effect on the employee's psychological well being. Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
We have conducted an exhaustive search for a Louisiana case which enunciates the elements of a quid pro quo harassment claim; however, we have not found one. Under the federal jurisprudence interpreting Title VII, the following elements are necessary to prove a quid pro quo harassment claim, namely: (1) employee was a member of a protected class, i.e., the employee is a man or a woman; (2) employee was subject to unwelcome sexual harassment, i.e., sexual advances, request of sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome; (3) harassment was based upon sex, i.e., but for the fact of her sex, the plaintiff would not have been the object of harassment; and (4) harassment affected a term, condition, or privilege of employment. See generally Highlander v. K.F.C. National Management Co., 805 F.2d 644 *549 (6th Cir.1986); Nichols v. Frank, 42 F.3d 503 (9th Cir.1994).
In Highlander, 805 F.2d at 648-649, the United States Sixth Circuit Court of Appeals succinctly explained how quid pro quo harassment affects a term, condition, or privilege of employment and how quid pro quo harassment differs from hostile environment harassment:

Quid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. In [a] quid pro quo harassment action, the employee bears the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's [sic] failure to submit to the sexual demands of the supervisory employees.
* * * * * *
[U]nlike quid pro quo sexual harassment claims which may be predicated upon a single incident of sexual harassment, hostile environment claims are characterized by varied combinations and frequencies of hostile sexual exposures. [Citations omitted].
In analyzing this issue, we note that there is a split in the federal jurisprudence as to whether a plaintiff has to prove that the employer knew or should have known of the harassment and failed to take proper remedial action. Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311 (11th Cir.1989) (Corporate defendant is strictly liable for supervisor's harassment because when a supervisor requires sexual favors as quid pro quo for job benefits, the supervisor, by definition, acts as the company); Nichols, 42 F.3d 503 (Once quid pro quo sexual harassment has been established by the employee, the harasser's employer is, ipso facto, liable). Cf. Jones v. Flagship International, 793 F.2d 714 (5th Cir.1986) (In order for an employee to establish a quid pro quo sexual harassment claim, the employee must prove respondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action); Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044 (3d Cir.1977) (Title VII is violated when a supervisor, with the actual or constructive knowledge of the employer, makes sexual advances toward an employee and conditions that employee's job statusevaluation, promotion, continued employment, or other aspects of career developmenton a favorable response to those advances, and the employer does not take prompt and appropriate remedial action after acquiring such knowledge). Additionally, we note that in the recent case of Sims v. Brown & Root Industrial Services, Inc., 889 F.Supp. 920 (W.D.La.1995), in which the plaintiff advanced claims under Title VII and La.R.S. 51:2231, the United States District Court for the Western District of Louisiana, citing Jones, 793 F.2d 714, held that in a quid pro quo sexual harassment claim a plaintiff must prove that the employer knew, or should have known, of the harassment in question and failed to take prompt remedial action.
Applying the foregoing legal principles to the facts in the case sub judice, we cannot say that the trial judge erred in dismissing plaintiffs' sexual harassment claims. Plaintiffs simply failed to carry their burden of proving the existence of a hostile environment or that the incident at issue was quid pro quo sexual harassment. There was simply no proof that the incident was aimed at any one gender (the restroom in question was unisex) or that Wal-Mart had knowledge of the camera and failed to take action. Additionally, plaintiffs conveniently avoid the fact that they stipulated that Mr. Burleigh's only motive in placing the camera in the ceiling was to catch a thief. Once they entered into that stipulation they were precluded from speculating that there may have been some other, sinister motive for Burleigh's actions. Finally, we find no evidence that Wal-Mart engaged in a coverup. While they may have explained the events in the *550 light most favorable to Wal-Mart, there is no evidence that any viewing of personnel took place or that any tapes were made of anyone in the restroom.
Accordingly, we find on error in this portion of the trial.

DAMAGE PHASE
Four plaintiffs testified in this portion of the trial: Michele Robertson Hebert, Mona Meche, Linda Ardoin, and Theresia Powell. Mrs. Hebert was awarded $10,00.00 and Mrs. Meche $1,000.00 in damages. The other two ladies were awarded no damages by the jury.
Clearly, Mrs. Hebert deserved the largest award. It was established that she had been the victim of sexual abuse as a child and that she had problems stemming from that abuse into her teens and early adulthood. She had been hospitalized twice for these problems and the incident at work had caused a relapse in her condition, necessitating her return to psychological counseling. Mrs. Hebert was treated by Dr. Kenneth R. Bouillion in October and November 1992 and again in September and October 1994. In his opinion, Mrs. Hebert "experienced a traumatic stress reaction as a result of this event." He opined that she needed approximately two years of weekly therapy sessions to completely recover for the effects of this event. However, we note that over the course of two years, Mrs. Hebert participated in only five therapy session with Dr. Bouillion. Additionally, Dr. Bouillion stated, that because of Michele's past history, he would have expected her to have "ups and downs" in her mental state even without the camera incident.
The remaining three plaintiffs who sought psychological care were treated by Dr. Lynn Aurich. All three were referred to Dr. Aurich by their attorney. Dr. Aurich diagnosed all three of the plaintiffs he treated as suffering from an "adjustment disorder with mixed emotional features."
Mrs. Meche was seen five times by Dr. Aurich between August 11 and November 17, 1992. Dr. Aurich opined that Mrs. Meche made progress during the time he treated her. He noted that she discontinued therapy the week after her husband underwent surgery and suggested that she would benefit from additional weekly treatment of not more than one year's duration. On cross examination, it was brought out that Mrs. Meche had undergone back surgery the week before her last visit. Dr. Aurich readily admitted that a back injury which requires surgery often causes the same aggregate of symptoms Mrs. Meche delineated in connection with the camera incident.
Dr. Aurich saw Mrs. Audoin on only one occasion, June 18, 1993. He opined that she, too, would benefit from therapy. Dr. Aurich, however, was unaware of other "stressors" in Mrs. Audoin's life such as an ongoing conflict with a neighbor which had resulted in criminal charges being filed and her husband being involved in a disabling accident, the details of which was brought out at trial.
Mrs. Powell stated that saw Dr. Aurich twice; however, his records document three visits between October 6 and November 3, 1992. Dr. Aurich stated that Mrs. Powell had improved over that time period and concluded that, with continued treatment, she would recover completely. It is obvious that the jury did not place any credence in Mrs. Powell's claims of stress and anxiety. This is within the providence of the trier of fact and we must give the trier of fact great deference on this matter. Roberts v. Lowry, 96-050 (La.App. 3 Cir. 5/8/96); 673 So.2d 1323; In re Bordelon, 95-1194 (La.App. 3 Cir. 3/6/96); 670 So.2d 676.
Finally, as to the jury's failure to award any damages to Mrs. Ardoin and Mrs. Powell, we find two common facts worth mention. First, both ladies were referred to treatment by their attorney some time after the camera event: Mrs. Powell, three months after the incident and Mrs. Ardoin almost one year afterwards. And second, neither plaintiff sought treatment for any length of time.
We find the damages award to the two plaintiffs herein to be very conservative. However, as the supreme court pointed out in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993); cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):

*551 In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art.1934(3)(1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
* * * * * *
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. [Footnote omitted.]
While we may disagree with the measure of damages the jury awarded, we cannot say that the awards were "beyond that which a reasonable trier of fact could assess for the effects of the particular injur[ies] to the particular plaintiff[s] under the particular circumstances."
By appellants' eleventh assignment of error they the jury was inconsistent in awarding damages to some plaintiffs and not to others. We have already addressed the jury's refusal to award damages to Ms. Powell and Mrs. Ardoin. The remaining plaintiffs sought no medical or psychological care at all. Obviously, the jury concluded that they failed to suffer any damages. Anger with and disappointment in the faith one places in one's employer are simply not elements of damage.
As we stated at the outset, plaintiffs failed to brief assignments of error twelve through twenty. Accordingly, as per Uniform Rules, Courts of Appeal Rule 2-12.4 we consider these assignments abandoned.
Accordingly, for the reasons stated, the verdict of the jury and the judgment of the trial court are affirmed. All costs of this appeal are assessed against appellants.
AFFIRMED.
WOODARD, J., concurs.